UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA NICHOLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-833 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| PULTE HOMES CORP. and | ) | |
| CHRIS NAATZ, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Donna Nicholson was employed by Defendant Pulte Homes Corp.

("Pulte") until June 24, 2009, when her employment was terminated. Pulte asserts this

was for performance reasons. Nicholson claims it was because she was taking time off of

work to care for her ailing parents. Nicholson brought this lawsuit against Pulte and

Chris Naatz, Vice President of Sales and Marketing, alleging two counts under the

Family and Medical Leave Act of 1993 ("FMLA"), codified at 29 U.S.C. § 2601 *et seq.*

Count I alleges interference with her entitlements under the FMLA. Count II alleges that

Pulte retaliated against her for asserting her FMLA rights. Defendants moved for

summary judgment on both counts. For the reasons discussed below, Defendants' motion

is granted.

# BACKGROUND

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1]

At the time her employment with Pulte was terminated in June of 2009, Nicholson had worked as a sales associate for ten years. Pl. 56.1(b) ¶ 1. Maria Wilhelm was her general sales manager, and Chris Naatz served as Pulte's Vice President of Sales and Marketing. *Id.* ¶ 1.

Then-current forces in the housing market had required Pulte to heighten its focus on meeting sales performance projections, and Pulte's entire sales force had worked for several years with an imperative to meet established sales goals. Def. 56.1(a) ¶ 32. Nicholson was placed on her first performance-improvement plan in 2007. *Id.* ¶ 33. In Nicholson's February 2008 performance evaluation, Wilhelm stated that it was important to achieve consistency in meeting monthly goals; admonished Nicholson that she had at times allowed the challenging market circumstances to affect her attitude, which caused her sales to suffer; and instructed Nicholson that it was critical for her to maintain a positive and proactive mindset going forward. *Id.* ¶¶ 34-35. One of Nicholson's

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

objectives for 2008 was to meet her sales goal at least nine months out of the year; she fell short, satisfying her monthly goal only seven months out of the year. *Id.* ¶ 36.

On Nicholson's performance evaluation from February 15, 2009, Wilhelm noted that Nicholson had been successful in past months due to her positive attitude and experience. *Id.* ¶ 37. Wilhelm also praised Nicholson for making a sale and for doing an "outstanding job" of conducting "world-class" demonstrations of Pulte homes to customers. Pl. 56.1(b) ¶ 3. In a follow-up email to Nicholson, Wilhelm reiterated that "it is imperative to hit our goals each and every month," that "we cannot let a month or two slip by without doing everything possible to sell homes," and that "consistency will be extremely important as it was in 2008." Def. 56.1(a) ¶¶ 38, 39. Nicholson understood that it was important to meet sales goals every month and to achieve consistency in her performance. *Id.* ¶ 40. Although Wilhelm described Nicholson's attitude in 2008 as good, overall, Wilhelm described Nicholson's overall attitude in the first half of 2009 as "somewhat negative" and "almost like defeated." Pl. 56.1(b) ¶ 21.

In February 2009, Wilhelm grew concerned that Nicholson was not correctly managing expectations of some prospective buyers or putting Pulte's interests first. Def. 56.1(a) ¶ 43. In the course of exchanging emails regarding those potential buyers and reading Nicholson's comments about Pulte's sending "mixed messages" to them, Wilhelm became further concerned that Nicholson was not accepting responsibility for her role in the situation. *Id.* ¶ 44.

In March 2009, Pulte's corporate headquarters received two complaints arising from a customer's experience with Nicholson, one of which stated, "DONNA IS RUDE,

CONDESCENDING AND UNPROFESSIONAL. I WILL NOT BE BUYING A

PULTE HOME FROM YOU BECAUSE OF DONNA . . . TREATING PEOPLE LIKE

CRAP IS NOT THE WAY I DO BUSINESS." *Id.* ¶ 45. Concerned because this was the

first time a customer had complained to the corporate office about one of her sales

associates, Wilhelm told Nicholson that the complaints should be viewed as a learning

opportunity and directed Nicholson to take every customer as far through the sales

process as possible. *Id.* ¶ 46. Nicholson emailed Wilhelm to say that the customer

caused her to be concerned about her safety. Pl. 56.1(b) ¶ 31. Wilhelm later learned of

an additional customer issue involving Nicholson: when Nicholson continued trying to

conduct a telephone conversation the customer wished to terminate, the customer said,

"Stop, Donna, stop," and eventually hung up the phone. Def. 56.1(a) ¶ 47.

During a field-operations meeting that took place in Nicholson's Cedar Ridge

sales community in March 2009, Nicholson reported to Pulte's Illinois leadership team

on the individuals she considered to be her top sales prospects.[2] *Id.* ¶ 48. Nicholson

should have been fully prepared to answer any and all questions pertaining to her

community. *Id.* ¶ 48. During the presentation, Naatz asked Nicholson questions about

---

[2] Throughout her responses to Defendants' Local Rule 56.1 Statement of Material Facts – and in a separately filed Motion to Strike, which was denied – Nicholson objects to "*post hoc* self-serving statement[s]" asserted in declarations filed with Defendants' Motion for Summary Judgment. It is true that a party opposing summary judgment cannot manufacture disputed facts by filing declarations that contradict earlier deposition testimony and that a defendant's failure to address a key issue until a declaration can raise credibility concerns. *See Fisher v. Avanade*, 519 F.3d 393, 406-07 (7th Cir. 2008). However, an affidavit should not be disregarded simply because it is "self-serving." *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006). Generally, the statements in the affidavits submitted by Defendants are based on personal knowledge and do not contradict anything identified in the record.

her prospects, and Nicholson's answers made him concerned that she did not possess the depth of information someone of her experience should have gathered from a top sales prospect. *Id.* ¶ 49. Based on this concern and on his perception that after nine months at Cedar Ridge, Nicholson had not taken steps to familiarize herself with the surrounding community, Naatz further worried that Nicholson's attitude was not at the level needed to meet her sales objectives. *Id.* ¶ 50.

After the meeting, Wilhelm instructed Nicholson to send an email to Naatz and herself acknowledging their concerns about her attitude by expressing a commitment to maintaining a positive attitude; Nicholson sent the email as requested, copying Wilhelm's suggested language nearly verbatim. *Id.* ¶ 51.

Nicholson's sales performance in 2009 ultimately fell short of her stated objectives. *Id.* ¶ 41. Although Nicholson met her gross sales goals for February and March 2009, Pl. 56.1(b) ¶ 2, she met her net monthly sales goals only once from January through June 2009; and in that six-month span, she made only three net sales, falling short of her target of 13 total net sales during that period, Def. 56.1(a) ¶ 42. Nicholson did not make a single sale in April 2009. *Id.* ¶ 52. On April 26, 2009, after months of discussions about putting Nicholson on a performance-improvement plan, Naatz asked Wilhelm for a plan for Nicholson. Pl. 56.1(b) ¶ 23.

On May 5, 2009, Naatz and Wilhelm, with feedback from their division president, placed Nicholson on a written warning and performance plan. Def. 56.1(a) ¶¶ 24, 53. The plan specifically identified Nicholson's sales results and attitude as areas of deficiency and established the expectations that Nicholson make two net sales in both

May and June and demonstrate a consistently enthusiastic attitude, evinced by completion of broker tours and realtor presentations, and by making 150 phone contacts each month. *Id.* ¶ 54. Although their general practice was to provide underperforming salespeople with 30-day performance plans, Naatz and Wilhelm gave Nicholson 60 days to improve her performance in recognition of her relatively long tenure with Pulte.[3] *Id.* ¶ 55. They also notified Nicholson that her performance under the plan would be assessed beginning on May 31, 2009, and that if she failed to meet the provisions of her plan, her employment might be terminated. *Id.* ¶ 56. Nicholson explained to Wilhelm that she could not work on her days off or outside normal business hours, but she did not express any need for or interest in taking time off from her normal working schedule. *Id.* ¶ 24. Wilhelm did not specifically tell her she would need to come and work on her days off. *Id.* ¶ 25.

Nicholson understood the performance expectations imposed upon her, that her continued employment depended on her progress during the term of the plan, and that Pulte might decide upon a course of action prior to the plan's expiration. *Id.* ¶ 57. At Wilhelm's instruction, Nicholson sent another email to Naatz and Wilhelm, acknowledging the concerns about her performance and stating that she had shifted her mental state and that she was motivated to meet the terms of her plan. *Id.* ¶ 58.

On May 26, 2009, Wilhelm sent an email to a number of sales associates, including Nicholson, stating that she expected each of them to do "whatever it takes (putting in longer hours, hitting realtor offices before hours, making 2x the number of

---

[3] Nicholson asserts that her 60-day plan was actually twice as onerous as a 30-day plan.

expected calls, etc.) to achieve our sales goals each and every month." Pl. 56.1(b) ¶ 25. Wilhelm did not observe Nicholson's working extra hours after the email was sent. *Id.* ¶ 25. Nicholson and another employee, Juan Chaidez, testified that they felt pressure to work long hours in order to achieve the types of expectations placed upon them by Pulte. *Id.* ¶ 26. Their perception was that those who were successful at Pulte worked long hours; those who did not work long hours were not successful or were not meeting expectations. *Id.* ¶ 27.

Nicholson did not sell a home in either May or June 2009; in fact, one of her previous sales cancelled in May, resulting in net sales of negative one during the plan period. Def. 56.1(a) ¶ 59. With Nicholson's performance showing no improvement by the last full week of June, Naatz, Wilhelm, and the division president concluded that Nicholson would not come close to meeting the requirements of her plan; on Monday, June 22, 2009, they decided to terminate her employment. *Id.* ¶ 60. Naatz and Wilhelm did not document their decision. Pl. 56.1(b) ¶ 32. Nicholson challenges their otherwise-unsupported, self-serving testimony regarding the date the decision was made but admits that she does not know when the decision was made. Def. 56.1(a) ¶ 73. Wilhelm testified that she does not know that she would have terminated Nicholson's employment if the decision was solely her own. Pl. 56.1(b) ¶ 30. Naatz and Wilhelm elected to notify Nicholson of this decision on Wednesday, June 24, 2009, the last day of Nicholson's workweek (she had Thursdays and Fridays off). Def. 56.1(a) ¶ 61.

On June 23, 2009, Wilhelm emailed a sales administrative assistant and Naatz, informing them that Nicholson used a Personal Time Off ("PTO") day that day because

her mother needed to be rushed to urgent care and asking that this information be recorded in the system that documented employees' vacation and sick days. Pl. 56.1(b) ¶ 28.

On June 24, 2009, Wilhelm notified Nicholson that her employment was terminated. Def. 56.1(a) ¶ 52. Nicholson's personal improvement plan was not set to expire for another eleven days. Pl. 56.1(b) ¶ 33. Of the thirty individuals that Wilhelm could recall being placed on personal improvement plans since she became a manager in 2003, Wilhelm was unable to recall any others whose employment had been terminated prior to the expiration of his or her plan. *Id.* ¶ 33. Although Wilhelm had seen sales associates sell multiple homes in a single week on several occasions, she and Naatz testified that they decided to terminate Nicholson's employment prior to the expiration of her plan because they had not noticed any consistent change in Nicholson's attitude and results. *Id.* ¶ 34. At the moment she learned of the decision, Nicholson concluded that the reason for her termination was her failure to meet plan objectives. Def. 56.1(a) ¶ 63. Prior to leaving the Cedar Ridge sales office, Nicholson told Wilhelm that her termination was a blessing and gave Wilhelm a hug. *Id.* ¶ 64.

Nicholson now contends, however, that Pulte terminated her employment to prevent her from exercising, or in retaliation for her exercising, her FMLA rights. She testified that she believed her capability to perform her job responsibilities to the best of her ability was compromised towards the end of her employment because caring for her parents made her unable to work outside of the regularly set 10:00 a.m. to 6:00 p.m. schedule. Pl. 56.1(b) ¶ 20.

8

Nicholson's father was diagnosed with leukemia in March 2005. Def. 56.1(a) ¶ 7. Although his condition progressively deteriorated through June 2009, Nicholson's father lived alone; bathed, groomed, dressed, and fed himself; prepared his own meals; cleaned and shopped for himself; drove himself around town; paid bills; and managed the other responsibilities of maintaining his home. Pl. 56.1(b) ¶ 4; Def. 56.1(a) ¶ 8. The only assistance Nicholson provided over this period of time was to attend occasional doctor's appointments to help her father understand and remember the doctor's information, which she did about five times in four years. Def. 56.1(a) ¶ 9.

Nicholson first told Wilhelm about her father's condition at the end of 2008, when she said that her father might need chemotherapy at some point in the first quarter of the next year and that she might need an unspecified amount of time off to attend appointments with her father, who planned on refusing treatment. Pl. 56.1(b) ¶ 12; Def. 56.1(a) ¶ 19. Wilhelm told Nicholson to let her know if there was anything she could do to help. Def. 56.1(a) ¶ 20. The next conversation Nicholson had with Wilhelm about her father's medical conditions was on April 25, 2009, when Nicholson asked to take off on April 27, 2009, to attend an appointment with her father about which she had forgotten. *Id.* ¶ 21. She told Wilhelm that her father's diagnosis had worsened to stage-3 cancer. Pl. 56.1(b) ¶ 4. Wilhelm told Nicholson she was "more than willing" to give her the day off to attend her father's afternoon appointment but that Nicholson would still have to attend a mandatory division meeting that morning before office hours. Def. 56.1(a) ¶ 22; Pl. 56.1(b) ¶ 14. At no time after April 27, 2009, did Nicholson ask Wilhelm for any time off to attend any appointments with her father. Def. 56.1(a) ¶ 23.

9

Nicholson's mother also had health problems. In March or April 2009, she experienced a large amount of weight loss in a short period of time; and Nicholson had to remind her to eat. Pl. 56.1(b) ¶ 6. Nicholson's mother lived in Nicholson's home, but she had her own room and did not require an in-home caregiver. Def. 56.1(a) ¶ 11. She was capable of bathing and dressing herself, preparing microwaveable meals and consuming them without physical assistance, and driving herself out for basic shopping at places such as Target. *Id.* ¶ 12. However, Nicholson provided her mother with medicine; reminded her to eat, take her medicine, change her clothes, and take a shower; washed her hair; took responsibility for paying her personal bills; and drove her to some of her doctor's appointments because her mother was not comfortable driving the necessary distance. Pl. 56.1(b) ¶ 8; Def. 56.1(a) ¶ 13. Nicholson tried to schedule her mother's appointments on Nicholson's days off so that they would not interfere with her work schedule. Def. 56.1(a) ¶ 14. Nicholson's mother was ultimately diagnosed with chronic kidney disease. Pl. 56.1(b) ¶ 6.

Nicholson believed that the proper procedure to follow in requesting time off of work was to ask Wilhelm for permission. *Id.* ¶ 10. In April 2009, Nicholson told Wilhelm she was driving her mother to medical appointments on her days off and explained that the appointments were scheduled on her days off so as not to interfere with her work schedule. Def. 56.1(a) ¶ 26. Wilhelm again told Nicholson to let her know if there was anything she could do to help. *Id.* ¶ 27. The next conversation Nicholson had with Wilhelm about needing time off to care for her mother was on June 23, 2009, when her mother experienced a confusion episode and Nicholson had to take her to the

emergency room. *Id.* ¶¶ 10, 28. Wilhelm did not raise any resistance to Nicholson's missing work that day. *Id.* ¶ 29. Her mother was diagnosed with a potentially life-threatening low sodium level that necessitated admission to the hospital for several days. Pl. 56.1(b) ¶ 9.

The following afternoon, Nicholson received a call from the hospital around 3:00 p.m. and asked Wilhelm for permission to leave early. *Id.* ¶ 29; Def. 56.1(a) ¶ 29. Wilhelm responded to say that she was currently in a meeting with Naatz and that she would come to the Cedar Ridge office around 5:00 p.m. to relieve her. Pl. 56.1(b) ¶ 29; Def. 56.1(a) ¶ 29. As discussed above, that is when Wilhelm notified Nicholson of her termination. Wilhelm did not mention Nicholson's parents as playing any role in the termination decision. Def. 56.1(a) ¶ 74. During the course of the conversation, Wilhelm did tell Nicholson that she was pregnant and that she did not want to tell her superiors for fear of losing her job when she took maternity leave. Pl. 56.1(b) ¶ 36.

Throughout Nicholson's employment, Wilhelm was supportive whenever Nicholson mentioned her parents; and when Nicholson sought time off – including for her own illness – Wilhelm was "more than willing" to accommodate her. Def. 56.1(a) ¶ 65. Wilhelm never informed any Human Resources ("HR") personnel that she thought Nicholson may qualify for FMLA leave, and no one at Pulte ever specifically requested documentation from Nicholson regarding her parents' medical conditions. Pl. 56.1(b) ¶¶ 15, 19.

Nicholson never directly discussed a need for any time off with Naatz; she had only one discussion in his presence regarding her parents' conditions. Def. 56.1(a) ¶ 16.

It was a "casual conversation" in March 2009, in which Nicholson spoke to another employee about the challenges of dealing with aging parents. *Id.* ¶ 16. Nicholson acknowledged that Naatz might not have been engaged in the conversation. *Id.* ¶ 17. She also acknowledges that she did not express any need to take time off from work to attend to her parents. *Id.* ¶ 17.

Other salespersons – including Wilhelm – have taken time off for medical reasons without having their employment terminated. *Id.* ¶ 68. At least eight other Illinois sales associates, many of whom have not exercised FMLA rights, have been placed on performance plans with identical or similar objectives to those of Nicholson. *Id.* ¶ 69. Juan Chaidez (one of the other individuals placed on a performance plan and Nicholson's former partner at Cedar Ridge) was also terminated for failing to meet his plan objections. *Id.* ¶ 70. On the other hand, the employment of Christine Kempher, a sales associate who was supervised in 2009 by Wilhelm and who failed to meet her sales goals in January, February, March, April, May, June, August, September, and October 2009, was not terminated for poor performance. Pl. 56.1(b) ¶ 37. Of the 47 sales associates employed by Pulte at any time in 2009, fourteen left in 2009; and Wilhelm knows of only two (Chaidez and Nicholson) whose employment was terminated. *Id.* ¶ 38. Of the eight individuals placed on performance plans, Nicholson was the only one with a 60-day plan period. Def. 56.1(a) ¶ 71. Nicholson has no personal knowledge as to how Naatz and Wilhelm managed the performance of other sales associates and has no idea what the terms of any other salesperson's performance plan may have been. *Id.* ¶ 66.

Pulte maintains an FMLA policy, contained in the Employee Handbook distributed to employees. *Id.* ¶ 1. The policy explains that a request for a leave of absence covered by the FMLA must be made to the Human Resources department:

> You must request leave from Human Resources, not your manager or anyone else. Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. Employees must provide sufficient information for the Company to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave . . . . Employees will be required to provide a certification . . . supporting the need for leave.

*Id.* ¶ 2.

Nicholson understood that the provisions in the Employee Handbook generally applied to her, but she never communicated to any HR representative any need for taking time off to care for a parent's serious health condition. *Id.* ¶¶ 3, 5. Nor did she supply Pulte with any of the certification forms required by the written FMLA policy. *Id.* ¶ 5. The only people to whom Nicholson mentioned anything in either 2008 or 2009 about her parents' medical condition were her supervisors (Naatz and Wilhelm) and two other non-HR individuals. *Id.* ¶ 6. Nicholson testified, however, that she would have exercised FMLA rights if she knew she was entitled to take leave to care for her parents. Pl. 56.1(b) ¶ 19.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The FMLA entitles eligible employees to as many as twelve work weeks of leave during any twelve-month period in order to care for a parent with "a serious health condition." 29 U.S.C. § 2612(a)(1)(C). It is unlawful for a covered employer to interfere with an employee's attempt to exercise any FMLA entitlements. 29 U.S.C. § 2615(a)(1).

14

It is also unlawful for an employer to retaliate against an employee who exercises FMLA rights. *See* 29 U.S.C. § 2615(a)(2) (prohibiting discrimination against employee who opposes any practice made unlawful by the FMLA). Nicholson alleges that Defendants both interfered with her attempt to exercise an FMLA entitlement and retaliated against her for making that attempt.

### Count I

To prevail on an FMLA interference claim, an employee must establish the following: (1) that she was eligible for the FMLA's protections; (2) that her employer was covered by the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she provided sufficient notice of her intent to take FMLA leave; and (5) that her employer denied her right to those benefits. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (*Burnett*). No finding of ill intent is required. *Id.*

Here, there is no dispute that Nicholson was an eligible employee or that Pulte was covered by the FMLA. At issue is whether Defendants interfered with any FMLA rights, whether Nicholson was entitled to FMLA leave to care for her parents, and whether Nicholson provided sufficient notice to Defendants that she intended to take FMLA leave.

With regard to Nicholson's request to take off the day of April 27 to attend an appointment with her father, there is no evidence that Defendants interfered with her request. Nicholson did not make her request until two days before, and Wilhelm told her she was "more than willing" to accommodate her but that Nicholson would still need to attend a mandatory division meeting that morning. Nicholson's father's appointment was

in the afternoon. To the extent Nicholson was entitled under the FMLA to take a leave of absence to attend an appointment with her father, Defendants did not interfere with her right to do so.

Nor did Defendants interfere with Nicholson's request to take her mother to the hospital on June 23 or her request to leave early the next day to visit her mother in the hospital. Wilhelm excused her from work on June 23 without interference and made arrangements to let Nicholson leave early on June 24. Thus, the only arguable act of interference is when Nicholson's employment was terminated the following evening after she asked Wilhelm to relieve her. Termination of employment can constitute interference with an employee's right to an FMLA entitlement. *See Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) (*Kauffman*).

Defendants first argue that Nicholson's failure to comply with Pulte's written FMLA policy conclusively proves she did not have any FMLA entitlement and did not provide proper notice to her employer. As set forth above, it is undisputed that Pulte had an FMLA policy in place that required employees to direct all requests for leave to HR and not to their supervisors. It is also undisputed that Plaintiff never requested a leave of absence through HR.

Employees are required "to comply with the employer's usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. § 825.302(d). When an employee fails to comply with such mandatory policies, she fails both to exercise FMLA rights and to provide sufficient notice of the intent to take leave and, therefore, cannot state a valid interference claim. *Brown v. Auto. Components Holdings, LLC*,

16

622 F.3d 685, 690 (7th Cir. 2010) (*Brown*); *Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 972 (7th Cir. 2000) (*Gilliam*). In both *Brown* and *Gilliam*, an employee was fired for failure to comply with an attendance policy; and in both cases, the Seventh Circuit held that the employer did not interfere with the employee's FMLA rights by upholding those policies, regardless of whether the reason for the absence would qualify for leave under the FMLA. *Brown*, 622 F.3d at 690; *Gilliam*, 233 F.3d at 971-72.

Unlike the employers in *Brown* and *Gilliam*, Defendants in this case have never asserted that Nicholson's employment was terminated because she violated an attendance policy; they claim it was terminated because of her performance. In response to Nicholson's after-the-fact claim that Defendants interfered with her right to FMLA leave, Defendants assert that they cannot be liable under the FMLA because Nicholson did not follow Pulte's "usual and customary" requirements for requesting leave.

Although Nicholson admitted that Pulte's Handbook contained the above-quoted language regarding the proper procedure for taking FMLA leave, the relevant handbook section was not provided to the Court.[4] Defendants' Exhibit D, which is characterized as "Excerpts of Pulte Homes Employee Handbook," consists only of a cover page, a table of contents, and a single page from the handbook that is not relevant to leaves of absence. The "Leaves of Absence" section was not provided, and the portion quoted in

_____

[4] Moreover, Defendants do not provide any evidence that Nicholson was bound by the terms of the Handbook. There is no evidence of a signed acknowledgement form, and Defendants merely rely on testimony that Plaintiff admitted having read it. However, Nicholson's testimony is that she "read through it briefly at some point," though she "couldn't tell you exactly when," and that she "read through it again after her termination." Pl. Dep. at 64. Additionally, Defendants' only support for the proposition that Nicholson is bound by the Handbook simply because she received a copy of it is a citation to a nonprecedential disposition from the Seventh Circuit.

Defendants' summary-judgment materials is redacted. The quoted provision indicates that employees are required to give at least 30 days of advance notice for foreseeable leave, but it is silent as to the appropriate procedure for a need for leave that is not foreseeable (like Nicholson's unexpected need to go to her mother's hospital). According to the applicable regulations, when the need for leave is not foreseeable, an employee must notify his employer "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). Thus, it cannot be said for purposes of summary judgment that Pulte's FMLA policy forecloses Nicholson's claims.

Moreover, it is undisputed that Nicholson requested time off from her supervisor and that she believed she followed Pulte's usual and customary procedures by doing so. Defendants' own evidence shows that Wilhelm requested that Nicholson's absence on June 23, 2009, be categorized as a "PTO day," *see* Def. Ex. G, and there is no proof that she did not follow the usual and customary requirements for taking a PTO day. It is also undisputed that Nicholson again requested time off through Wilhelm on the following day before her employment was terminated. The table of contents in Defendants' Exhibit D shows that the Handbook also contained a section, titled, "Personal/Sick Time (PTO)." Like the FMLA section, that section was omitted from Defendants' summary-judgment materials. Defendants have not shown that Nicholson failed to follow the proper procedures for requesting her time off. Thus, *Brown* and *Gilliam* are not dispositive.

However, it is not sufficient under the FMLA for Nicholson simply to have cleared her request for time off through proper procedures. The relevant issue is whether

Nicholson put Defendants on notice that she might have an *FMLA-qualifying* need for time off. *See Burnett v. LFW, Inc.*, 472 F.3d 471, 478-79 (7th Cir. 2006). An employee seeking to invoke FMLA protection must provide notice of his or her intent to take FMLA leave. *De la Rama v. Ill. Dept. of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008). Although that notice need not specifically refer to the FMLA, it "must succeed in alerting the employer to the seriousness of the health condition." *Id.* (quoting *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007)); *see also Burnett*, 472 F.3d at 478-79. "Indeed, 'the employee can be completely ignorant of the benefits conferred by the Act.'" *Id.* at 479 (quoting *Stoops v. One Call Commc'ns.*, 141 F.3d 309, 312 (7th Cir. 1998)). Consequently, Nicholson was not obligated to invoke the procedures in Pulte's Handbook regarding FMLA leave specifically (as opposed to procedures regarding leave generally), provided she put Defendants on notice of her need for leave. When leave is requested to care for a family member, notice should indicate that the family member's condition renders that person unable to perform daily activities. 29 C.F.R. § 825.302(c).

Nicholson has failed to identify sufficient evidence that Defendants were aware of any intent to take FMLA leave at any time before or after her June 24 termination. With regard to Nicholson's father, the evidence shows that he was able to care for himself and that Nicholson attended five appointments with him over the course of four years. With one exception, there is no evidence that Nicholson had to take any time off to attend any of those appointments. And at no time after the April 27 appointment did Nicholson ask for time off to care for her father. Although Nicholson asserts that she told Wilhelm in

19

late 2008 that she would need to attend some appointments with her father in the first quarter of 2009 and that Wilhelm was aware that her father was diagnosed with stage-3 cancer, Nicholson identifies no evidence that specifically indicates her father would need additional care that would require leave on Nicholson's part. In sum, the evidence about Nicholson's father's need for care is insufficient to support a reasonable inference that Nicholson required FMLA leave, much less an inference that Defendants had reason to know of such a requirement.

Nicholson also comes up short on evidence that Defendants were aware of any need for Nicholson to care for her mother. In April 2009, Nicholson told Wilhelm she was taking her mother to medical appointments on her days off. Although Nicholson had to give her mother daily reminders and provided some care outside of work hours, the evidence shows that Nicholson's mother was otherwise able to care for herself. Moreover, there is no evidence that her mother's care was discussed at all until June 23 when Nicholson was allowed to miss work to take her mother to the hospital; and there is no evidence that the admission of Nicholson's mother to the hospital would require Nicholson to take a leave of absence to care for her (immediately or in the future) or that Defendants should have been on notice that she needed to take such a leave. The fact that Nicholson's single request to leave work a few hours early to talk to her mother's doctor

at the hospital cannot, as a matter of law, be deemed notice of an intent to take a leave of absence under the FMLA.[5]

"[A]n employee's failure to comply with the notice requirements of the FMLA and its regulations 'forecloses . . . an FMLA interference claim because [the employee] did not fulfill her obligations in order to be protected.'" *Righi v. SMC Corp.*, 632 F.3d 404, 411 (7th Cir. 2011) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)). When all reasonable inferences are drawn in Nicholson's favor, there is insufficient evidence to show that Defendants were aware that Nicholson's parents had any serious health condition that required Nicholson to take time off of work to care for them. Defendants are entitled to summary judgment on Count I.

### Count II

Nicholson also asserts that Defendants retaliated against her for asserting rights under the FMLA. The difference between an interference/entitlement theory and a discrimination/retaliation theory is that the latter requires evidence of discriminatory or retaliatory intent, while the former merely requires proof that the employer denied the employee an entitlement under the FMLA. *Kauffman*, 426 F.3d at 884. Similar to other claims of discrimination, a charge of retaliation can be supported under direct or indirect methods of proof. *Burnett*, 472 F.3d at 481. Under the direct method, a plaintiff must present evidence that his employer took a materially adverse action against him on

---

[5] Defendants also argue that neither of Nicholson's parents required her care. It is unnecessary to address this argument in light of the analysis herein. Further, as explained below, even if Nicholson's parents did have "serious medical conditions" that specifically required Nicholson to care for them, the evidence is insufficient to show any genuine issue of fact as to whether Defendants had notice of that need.

account of his protected activity. *Id.* (citation omitted). Under the indirect method, a plaintiff must show that after engaging in a protected activity, she was treated less favorably than other similarly situated employees who did not engage in that same activity, even though she was performing her job in a satisfactory manner. *Id.* at 481-82 (citing *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006)).

Nicholson alleges that Defendants retaliated against her by placing her on a performance-improvement plan and by terminating her employment. Under both the direct and indirect methods of proof, Nicholson cannot defeat Defendants' motion for summary judgment without proof that she engaged in a protected activity under the FMLA. As discussed above, there is no proof that she did. Regardless of the seriousness of Nicholson's parents' health conditions, the evidence is insufficient to allow a reasonable jury to conclude that Defendants were aware that Nicholson needed to take a leave of absence to care for them. Because the evidence is insufficient to show that Nicholson asserted any rights under the FMLA, she cannot prevail on a claim that Defendants retaliated against her for asserting those rights. Defendants are entitled to summary judgment on Count II, as well.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted as to both of Nicholson's claims under the FMLA.

Date: May 3, 2011

JOHN W. DARRAH
United States District Court Judge